The TWENTY SEVEN TRUST

v.

**REALTY GROWTH INVESTORS and RGI Holding Company, Inc.**

Civ. A. No. M–81–2728.

United States District Court,
D. Maryland.

Feb. 22, 1982.

William E. Taylor, III, James P. Golden, Barry Genkin, and Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Gerard P. Martin, H. Russell Smouse, and Melnicove, Kaufman, Weiner & Smouse, Baltimore, Md., for plaintiff.

Donald E. Sharpe, Frank R. Goldstein, Robert J. Mathias, and Piper & Marbury, Baltimore, Md., for defendants.

### MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

The plaintiff, the Twenty Seven Trust (Twenty Seven), brought this action against Realty Growth Investors (Realty) and RGI Holding Company, Inc. (RGI) on October 22, 1981. Twenty Seven's four-count complaint alleged violations of the federal securities laws and Maryland common law in connection with RGI's attempt to acquire all of the shares of beneficial interest in Realty.[1] On October 23, 1981, the Chambers Judge denied Twenty Seven's request for a temporary restraining order which, if granted, would have enjoined a special meeting of Realty's shareholders called to approve a

---

1. Paper No. 1.

"squeeze-out merger" between Realty and a wholly-owned subsidiary of RGI.[2]

Twenty Seven filed an amended complaint on November 12, 1981, adding a fifth count based on an alleged discriminatory distribution of cash and securities by Realty to its shareholders.[3] Twenty Seven also filed a petition for appraisal under *Md. Corps. & Ass'ns Code Ann.* §§ 3–201 to 3-213 (1975 & 1981 Cum.Supp.), for a determination of the "fair value" of its Realty shares.[4]

The defendants have moved, pursuant to Rule 12(b)(6), Fed.R.Civ.P., to dismiss Twenty Seven's amended complaint, leaving Twenty Seven solely to its remedy under the appraisal statute.[5] Twenty Seven has filed a memorandum opposing the defendants' motion,[6] and the court heard argument from counsel on February 5, 1982. Accordingly, the matters raised by the defendants' motion are ready for decision.

## I. *Overview*

Twenty Seven is a trust organized under the laws of New York. At all times relevant to this litigation, Twenty Seven was the owner of 22,500 shares of beneficial interest in Realty, representing 6.9% of the issued and outstanding shares of beneficial interest. Realty is a Maryland real estate investment trust (RIT) formed in 1971. RGI is a Delaware corporation formed by American Invesco Corporation (Invesco). As a consequence of the events at issue in this litigation, RGI has become Realty's sole shareholder.

Pursuant to a tender offer dated April 24, 1981, RGI offered a cash price of $14.31 per share for all the outstanding shares of beneficial interest in Realty. The offer was contingent upon the tender of at least 90% of the shares, and stated that if less than 100% of the shares were tendered, RGI would consider a merger between Realty and an RGI affiliate to eliminate any remaining minority interest in Realty.

The tender offer document also disclosed that Realty's trustees had already reached an agreement with Invesco whereby Realty would call a special meeting of its shareholders for the purpose of approving a distribution by Realty to its pre-tender shareholders. Shareholders owning 1,000 or less Realty shares were to receive $17.19 per share in cash. Shareholders owning more than 1,000 shares were to receive not cash, but rather secured, interest bearing notes in the face amount of $15.29 per share and distribution certificates. The proposed distribution was also contingent on at least 90% of the Realty shares being tendered to RGI. Neither the tender offer document nor the Notice of Special Meeting explained the reason for discriminating between shareholders with different size holdings.

Both the tender offer document and the Notice of Special Meeting disclosed proposed transactions with two Realty trustees, John Wernwaiss and Thomas M. Graham, Jr., as well as with Robert L. Dillmeir, Realty's President. Wernwaiss and Graham were to receive certain Realty assets,[7] and Dillmeir was to be paid $100,000 in cash. Realty indicated that these transactions were being entered into solely to satisfy its obligations under existing employment contracts. Wernwaiss and Graham, together with Graham's father, controlled approximately 40% of the Realty shares.

2. Paper No. 5.

3. Paper No. 9.

4. Paper No. 11.

5. Paper No. 14.

6. Paper No. 19.

7. The Realty assets to be transferred to Wernwaiss and Graham consisted of the following: (1) a $475,000 original principal amount, 10% interest Note due January 1, 1982 of the Botz-ler-Emory Columbia 1974 Limited Partnership, together with security therefor in the form of a second deed of trust covering the land and improvements owned by the 1974 Partnership; (2) a $50,000 original principal amount, 10% interest convertible Note of the Botzler-Emory Columbia Limited Partnership due January 1, 2013, which note is convertible into a 50% limited partnership interest in the Partnership; and (3) a limited partnership interest representing a 50% interest in the 1974 Partnership.

The funds necessary to finance the tender offer and distribution were to be supplied by Invesco and through future liquidation of Realty assets, principally The Regency Inn located in Kissimmee, Florida. The approximately $4,750,000 in cash required to purchase all the shares of beneficial interest, at the rate of $14.31 per share, was to come from a bank loan to Invesco, the proceeds of which were to be channeled to RGI. Realty's $5,000,000 plus obligations on notes and distribution certificates issued to those owning more than 1,000 shares were to be met by the subsequent sale of Realty assets.

Twenty Seven determined not to tender its shares and to vote against distribution and, on May 21, 1981, delivered to Realty a formal written objection to the distribution. Twenty Seven's position on the tender and distribution was based on its allegations of the inadequacy of the tender price, the lack of a proper business purpose, the lack of proper disclosure concerning the reasons for the contemplated transactions and the illegality of the distribution.

Twenty Seven believed that the undisclosed purpose of these transactions, and the contemplated merger, was an attempt to secure for RGI and Invesco the benefits of Realty's tax loss carry forward to the exclusion of Realty's minority shareholders. As structured by the defendants and Invesco, RGI was paying approximately $5,000,000 in cash and committing Realty assets worth in excess of $5,000,000 to obtain control of Realty's $9,900,000 of net worth at January 31, 1981 and to discharge the purported obligations to Realty trustees and officers. Because Realty's asset base had been eroded through commitment of its major income producing assets to discharge the obligations under the notes and distribution certificates and to Messrs. Wernwaiss, Graham and Dillmeir, Realty apparently would lack the internal capacity to generate enough earnings to recover the cash being invested by RGI, let alone return a profit. Twenty Seven alleges something more was intended, but not disclosed.

Given the cost of RGI's acquisition and Realty's condition, the defendants' entire course of conduct is understandable, as Twenty Seven sees it, if, and only if, Invesco and RGI had undisclosed plans for exploiting Realty's $15,300,000 tax loss carry forward. Twenty Seven contends it will prove at trial that such plans existed and that to receive the maximum benefit from the tax loss carry forward, the defendants and Invesco decided to eliminate any minority interest in a manner that (1) precluded the minority from participating in a much enlarged entity and (2) avoided any current valuation of the minority interest that included the potential value of the tax loss carry forward. To accomplish this, Twenty Seven claims it was necessary for the defendants to conceal their plans, even if that involved a violation of federal and state securities laws.

The claimed effect of defendants' alleged scheme on Twenty Seven is as follows. If Twenty Seven were ultimately forced to accept the package offered by the defendants, it would receive only cash, a note and a distribution certificate having an estimated present value of less than $30.00 per share for shares of beneficial interest for which its assignor, and all other original subscribers, paid $100.00 per share. According to Twenty Seven, its 6.9% proportionate share of the potential advantage to be derived from the tax loss carry forward exceeds $1,000,000. Twenty Seven further alleges that it will receive no compensation for this under the defendants' scheme.

In response to the tender offer and the proposed distribution, all of the Realty shareholders other than Twenty Seven tendered their shares and voted in favor of the proposed distribution. As a result, RGI and Twenty Seven were left as the only Realty shareholders.

After the completion of the tender, Twenty Seven requested Realty and RGI to provide it with financial data and information on their plans for using Realty's tax loss carry forward. These requests were initially met with a renewed offer to purchase Twenty Seven's Realty shares, and

then with silence. Twenty Seven asserts that all it ever received through October 23, 1981, were unaudited interim financial statements, containing neither footnotes nor explanations of the apparent changes in Realty's financial position. Twenty Seven further alleges that it never received any information relating to the tax loss carry forward.

Pursuant to a Notice dated October 12, 1981, Realty scheduled a second Special Meeting of Shareholders for October 23, 1981. The stated purpose of this meeting was to consider a resolution approving the merger between Realty and Realty Growth Corporation (RGC), a Maryland corporation and a wholly owned RGI subsidiary. Under the plan of merger, Twenty Seven would be forced to accept $14.31 per share in cash in exchange for its 22,500 shares. The remaining Realty shares held by RGI would be cancelled. The stock would be exchanged for new shares of beneficial interest in Realty to be issued to RGI, leaving RGI as the sole Realty shareholder.

Prior to the scheduled meeting, Twenty Seven objected in writing to the proposed merger. At the shareholders' meeting on October 23, 1981, Twenty Seven cast the votes represented by its 22,500 shares against the plan of merger. RGI voted the remaining Realty shares in favor of the plan of merger, with the result that RGC was merged with and into Realty. The Articles of Merger were filed with the Maryland Secretary of State on October 23, 1981.

## II. Discussion

Twenty Seven's amended complaint contains five claims for relief: (1) Count I alleges a violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.-10b–5 (1981); (2) Count II alleges that the defendants, as majority shareholders, breached their common law fiduciary duty

as to Twenty Seven, the minority shareholder, in connection with the merger; (3) Count III alleges common law fraud in connection with the proxy materials; (4) Count IV alleges a violation of the Maryland Securities Act, *Md. Corps. & Ass'ns Code Ann.* §§ 11–301, 11–703 (1975 & 1981 Cum. Supp.); and (5) Count V alleges unlawful shareholder discrimination in connection with Realty's May, 1981 distribution.

In its memorandum, Twenty Seven states that its primary objectives in this litigation are two-fold:

"1. To have the merger held illegal and to have the Court, pursuant to its equitable powers, order Realty to issue Twenty Seven shares of beneficial interest equal to 6.9% of the currently issued and outstanding shares; and

2. To have the distribution held illegal and to have the Court order Realty to pay Twenty Seven $17.19 per share in cash in exchange for the note and Distribution Certificate Twenty Seven was wrongfully compelled to accept." [8]

At the hearing of February 5, 1982, counsel for Twenty Seven clarified the plaintiff's position in several important respects. First, Twenty Seven is neither seeking the rescission of the tender nor basing any alleged violation of section 10(b) or Rule 10b–5 on the disclosures associated with that transaction. In other words, Twenty Seven does not contend that the defendants' disclosures as to the tender offer were misleading as to itself or as to those persons who tendered their Realty shares in response to RGI's offer.

Second, Twenty Seven's contentions regarding the defendants' alleged violations of section 10(b) and Rule 10b–5 are based solely on the events associated directly with the subsequent merger. In essence, Twenty Seven contends that the merger had no valid business purpose and that the defendants violated section 10(b) and Rule 10b–5

---

8. Paper No. 19, at 7. Twenty Seven seeks a monetary recovery, under either the Maryland appraisal statute or the federal securities laws, only if, and to the extent that, the court does not grant equitable relief.

by failing to disclose to Twenty Seven the true purpose of the merger.[9]

The standards applicable to the defendants' dismissal motion were summarized by this court in *Chertkof v. Mayor and City Council of Baltimore*, 497 F.Supp. 1252 (D.Md.1980), as follows:

> A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. Yet, it is well established that the "complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980), *citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–106, 2 L.Ed.2d 80 (1957). *See Tahir Erk v. Glenn L. Martin Co.*, 116 F.2d 865, 870 (4th Cir. 1941). In ruling on a motion to dismiss, the court must consider as true all of the properly pleaded allegations contained in the complaint. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). Moreover, the allegations will be construed liberally in favor of the pleader, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and the court must disregard the contrary allegations of the opposing party. *A. S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969).

497 F.Supp. at 1258.

With the above comments in mind, the court will assess the legal sufficiency of each of Twenty Seven's claims.

### A. *Section 10(b) and Rule 10b–5*

The defendants first contend that Twenty Seven's federal securities law claims must be dismissed on the ground that the alleged misstatements and omissions, set out in paragraph 20 of the amended complaint, are not material. According to the defendants, because Twenty Seven had sufficient information to determine to vote against the proposed merger, and in fact so voted, their alleged failure to provide Twenty Seven with additional information could not have been material as a matter of law. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 474 & n.14, 97 S.Ct. 1292, 1301 & n.14, 51 L.Ed.2d 480 (1977); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

If the issue in this case were simply whether the plaintiff had adequate information regarding the fairness of the offering price, this court might agree with the above reasoning. Twenty Seven has alleged, however, that the merger was part of an "undisclosed scheme" by the defendants to obtain for themselves, to the exclusion of Twenty Seven, Realty's substantial tax loss carry forward. In other words, Twenty Seven has alleged that the "squeeze-out merger" had, as its sole but undisclosed purpose, the divestment of Twenty Seven of its interest in the tax loss carry forward.

Although the Supreme Court has not addressed the issue, the prevailing view among the lower federal courts in "squeeze-out merger" cases is that the materiality aspect of a claim under section 10(b) and Rule 10b–5 may be satisfied when: (1) there are misstatements and omissions flowing from the majority to the minority; and (2) the minority, if it had possessed the relevant information, could reasonably have sought and obtained relief such as an injunction under state law. *See, e.g., United States v. Margala*, 662 F.2d 622, 625–26 (9th Cir. 1981); *Healey v. Catalyst Recovery of Pa. Inc.*, 616 F.2d 641, 645–48 (3d Cir. 1980); *Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Insurance Co.*, 606 F.2d 602, 611–14 (5th Cir.

---

9. In light of these two points, the court concludes that the "reliance-causation," as distinguished from the "seller" theory applied in cases such as *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 635 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) and *Voege v. American Sumatra Tobacco Corp.*, 241 F.Supp. 369, 372–76 (D.Del.1965), is inapplicable to this case. The reason for this conclusion is that Twenty Seven does not base its claims on any alleged material omission relied on by the tenderers of Realty shares. *See also General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159, 164 (2d Cir. 1968).

1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980); *Goldberg v. Meridor*, 567 F.2d 209, 218–21 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Wright v. Heizer Corp.*, 560 F.2d 236, 249–50 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978).

Consequently, while an alleged breach of fiduciary duty, absent the element of deception, would not state a claim under section 10(b) and Rule 10b–5, *Santa Fe Industries, Inc. v. Green*, 430 U.S. at 474–77, 97 S.Ct. at 1301–02, a minority shareholder such as Twenty Seven may allege sufficiently the materiality aspect of a claim under the federal securities laws [10] if it can show, among other things, that the merger could have been enjoined under Maryland law.

According to the defendants, Twenty Seven cannot do so for two reasons: [11] (1) majority shareholders owe *no* fiduciary duties to minority shareholders under Maryland law; and (2) the statutory appraisal proceeding is a minority shareholder's exclusive state law remedy. The court disagrees with both of the above premises.

In *Cooperative Milk Service, Inc. v. Hepner*, 198 Md. 104, 81 A.2d 219 (1951), Judge Markell summarized the scope of a majority shareholder's duty as follows:

> "Stockholders are not trustees or *quasi* trustees for each other. *Shaw v. Davis*, 78 Md. 308, 318, 28 A. 619, 23 A.L.R. 294. But when majority stockholders use their voting power for their own benefit, for some ulterior purpose adverse to the interests of the corporation and its stockholders as such, they thereby become fiduciaries and violate their fiduciary obligations."

198 Md. at 114, 81 A.2d 219.

Subsequently, in *Baker v. Standard Lime & Stone Co.*, 203 Md. 270, 100 A.2d 822 (1953), Judge Henderson noted in dictum:

> "We may assume that if the plan were shown to be illegal, *untra vires* or fraudulent, it might be set aside by a court of equity. *Shaw v. Davis*, 78 Md. 308, 316 [28 A. 619, 621]. We may also assume that an equity court may set aside a transaction whereby majority stockholders use their voting power for their own benefit, for some ulterior purpose adverse to the interests of the corporation and its stockholders as such. *Cooperative Milk Service v. Hepner*, 198 Md. 104, 114, 81 A.2d 219, 224."

203 Md. at 283, 100 A.2d 822.

■ The above paragraph from *Standard Lime* was quoted with approval by Judge Collins in *DeBoy v. Harris*, 207 Md. 212, 224, 113 A.2d 903 (1955). The Fourth Circuit has cited *Hepner* and *Standard Lime* for the proposition that Maryland law "prohibits a controlling shareholder from using his control for some ulterior purpose adverse to the interests of the corporation and its stockholders." *Clagett v. Hutchison*, 583 F.2d 1259, 1265 (4th Cir. 1978). *Cf. Goodman v. Poland*, 395 F.Supp. 660, 678–80 (D.Md.1975) (corporate director not under fiduciary duty when purchasing corporate stock for own account, absent fraud or misrepresentation). Thus, while controlling shareholders are under no duty to the minority absent a "claim that fraud or other wrongful conduct was used against [them]," *Martin v. Carl*, 213 Md. 564, 570, 132 A.2d 601 (1957), a court of equity may intervene in corporate affairs in the appropriate case.

■ It must next be determined whether the appraisal remedy set out in *Md. Corps. & Ass'ns Code Ann.* §§ 3–201 to 3–212 (1975 & 1981 Cum.Supp.) is the exclusive state law remedy for shareholders such as Twenty Seven in a "squeeze-out merger" involving a RIT.[12] *See Santa Fe Industries, Inc. v. Green*, 430 U.S. at 474 n. 14, 97 S.Ct. at 1301 n. 14.

---

10. *E.g.*, a purchase or sale of securities, interstate commerce, causation, *scienter* and damage.

11. As will be seen in § II(B) *infra*, the defendants' argument that Twenty Seven has not alleged injury to itself is without merit.

12. The appraisal remedy is made applicable to RIT shareholders by *Md. Corps. & Ass'ns Code Ann.* § 8–501.1(i) (1981 Cum.Supp.).

The parties have not referred in their memoranda to, and the court has not discovered, any Maryland cases discussing whether the current appraisal statute, or its modern predecessor, *Md.Code Ann.* art. 23 § 69 (1951), is a dissenting shareholder's exclusive remedy in connection with a corporate or RIT merger or consolidation.[13] *Cf. United Funds v. Carter Products, Inc.,* [1963] Fed.Sec.L.Rep. (CCH) ¶ 91,288, at 94,-287–88 (Balt.City Cir.Ct. May 16, 1963) (minority shareholders entitled to injunction prohibiting proposed offering of nonvoting stock where primary purpose was to allow majority stockholder to dispose of his holdings without relinquishing control). Nevertheless, cases decided under prior Maryland appraisal statutes, as well as those from jurisdictions with similar appraisal statutes, suggest that it is not.

In *Homer v. Crown, Cork & Seal Co.,* 155 Md. 66, 141 A. 425 (1928), the dissenting minority filed a bill in equity to enjoin a shareholder meeting called to ratify a resolution authorizing the board of directors to sell all of the corporation's assets. The dissenters contended that the proposed transaction was fraudulent because "the price offered [was] grossly inadequate." 155 Md. at 81, 141 A. 425.

In affirming the Chancellor's dismissal of the bill, the Court of Appeals stated:

> "To sum up, the gravamen of the complaint is inadequacy of price. The fundamental difference between the majority and minority stockholders on this record is simply whether the value of the assets for the purpose of a sale in their entirety is the market value of the shares of stock or their book value. It is not perceived how holding to either view is practicing a fraud.
>
> * * * * * *
>
> "Aside from the fraud imputed from the price to be paid, there has been found no well pleaded allegations from which fraud affirmatively appears. The price offered, which was slightly in excess of

the market price, may be too low or too high to be taken as fair value, but, under the facts set forth in the bill of complaint, it is clearly not so inadequate, when weighed in connection with all the circumstances, as to make voidable for fraud the action of the directors of the two companies, and of the necessary majority of the stockholders of one and of the prospective action of a like majority of the shareholders of the other, in approving of the proposed sale. The fact the directors and officers and the required majority of stockholders are all acting in concert, as a result of a preconceived plan, necessarily subjects their action to close scrutiny, but of itself affords no basis for a charge of fraud. . . . . Unless acting *ultra vires,* illegally, or in bad faith, the directors of a corporation of the prescribed class have a statutory right to approve of a sale of all its assets as an entirety at a given price, and the stockholders owning two-thirds of all the stock outstanding and entitled to vote may approve of such sale, and it will then be made. This is a property right of which the shareholders, while acting in good faith, may not be deprived, no matter the motives nor the folly and consequences of their action. *Supra; France on Corporations* (2nd ed.), p. 59, sec. 38, p. 62. A sale so authorized is, however, subject to the right of the dissentient minority to be paid, notwithstanding the sale price, the fair value of his stock." 155 Md. at 83–85, 141 A. 425.

It is apparent that the court in *Homer* did not hold that the existence of the appraisal statute either abolished other equitable remedies or barred a court from reviewing the substantive fairness of an extraordinary corporate transaction. Instead, as Professor Vorenberg has commented, *Homer* indicates that when the appraisal statute applies to the transaction at issue "something more than unfairness in the relative distribution of economic benefits between the

---

**13.** A RIT merger proposal generally requires the approval of two-thirds of the shareholders entitled to vote on such a transaction. *Md.* *Corps. & Ass'ns Code Ann.* § 8–501.1(f) (1981 Cum.Supp.).

minority and the majority must be shown" before a court of equity will intervene. Vorenberg, Exclusiveness of the Dissenting Stockholder's Appraisal Right, 77 *Harv.L. Rev.* 1189, 1211 (1964) (footnote omitted).

The Court of Appeals next addressed the appraisal remedy in *American General Corp. v. Camp*, 171 Md. 629, 190 A. 225 (1937). In that case, the shareholders dissenting to a consolidation invoked the then existing appraisal statute, *Md. Code Ann.* art. 23, §§ 33–36 (1935 Supp.), for a determination of the fair value of their stock. Both the dissenting shareholders and the successor corporation sought review of the Circuit Court's appraisal in the Court of Appeals. Although the merits of the opinion deals with the appropriate means of determining fair value,[14] Judge Parke did note *Homer's* caveat to the general rule of nonintervention by courts in corporate affairs. 171 Md. at 636.

Nothing in the present appraisal statute, *Md. Corps. & Ass'ns Code Ann.* §§ 3–201 to 3–212 (1975 & 1981 Cum.Supp.), or the act from which it is derived, *Md.Code Ann.* art. 23, § 69 (1951), indicates that statutory appraisal was intended to be a dissenting shareholder's exclusive remedy in connection with mergers and consolidations under all circumstances. Indeed, *Homer* and *American General* suggest to the contrary.

The prevailing view among state courts in states having similar appraisal statutes, in the absence of statutory language making such appraisal the dissenting shareholders' exclusive remedy,[15] is that the statutory appraisal proceeding is not the dissenters' exclusive remedy in cases of fraud, illegal purpose or other wrongful conduct by the majority or controlling shareholder. In other words, upon proof of such wrongful conduct, a court of equity will provide appropriate relief apart from that set out in the appraisal statute. *See, e.g., Perl v. IU International Corp.*, 607 P.2d 1036, 1045–46 (Haw.1980); *Roland International Corp. v. Najjar*, 407 A.2d 1032, 1035–37 (Del.1979); *Pupecki v. James Madison Corp.*, 376 Mass. 212, 382 N.E.2d 1030, 1033 (1978); *Willcox v. Stern*, 18 N.Y.2d 195, 273 N.Y.S.2d 38, 219 N.E.2d 401, 405 (1966); *Berkowitz v. Power/Mate Corp.*, 135 N.J.Super. 36, 342 A.2d 566, 571–74 (1975). *See generally* 13 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5906.3 (rev.perm.ed. 1980 & 1981 Cum.Supp.); 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7165.1 (rev.perm.ed. 1973 & 1981 Cum.Supp.).

Accordingly, the court concludes that statutory appraisal is not, in all cases, a dissenting shareholder's exclusive remedy under state law.

▪ It does not follow necessarily from the above discussion, however, that Count I of the amended complaint states a claim for relief under section 10(b) or Rule 10b–5. To the contrary, there are several reasons why the relevant allegations, set out in paragraph 20, do not amount to a claim cognizable under the federal securities laws invoked by the plaintiff.

At first blush, Twenty Seven appears to have avoided the misstep taken by the plaintiff in *Sante Fe*, by alleging in the amended complaint that the defendants' conduct was deceptive. Shorn of its surplusage, however, it is plain that the deception complained of is the defendants' failure to reveal their own breach of fiduciary duty in orchestrating the merger. In other words, as conceded by Twenty Seven's counsel at the hearing of February 5, 1982, the gist of Count I is that the defendants either failed to disclose to, or actively concealed from, Twenty Seven that the purpose behind the merger was to deprive Twenty Seven of any share in Realty's fed-

---

14. *American General's* approach to determining fair value was modified in *Warren v. Baltimore Transit Co.*, 220 Md. 478, 154 A.2d 796 (1959).

15. *E.g., Yanow v. Teal Industries, Inc.*, 178 Conn. 263, 422 A.2d 311, 316–20 (1979) (appraisal remedy exclusive as to short form mergers). *See In re Jones & Laughlin Steel Corp.*, 488 Pa. 512, 412 A.2d 1099, 1102–04 (1980) (appraisal is exclusive post-merger remedy).

eral tax loss carry forward. Standing alone this, as well as similar allegations in the amended complaint, does not state a claim under section 10(b) or Rule 10b–5. *See, e.g., Biesenbach v. Guenther*, 588 F.2d 400, 401–02 (3d Cir. 1978); *Golub v. PPD Corp.*, 576 F.2d 759, 763–64 (8th Cir. 1978); *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1278, 1289–92 (N.D.Ill.1981); *Merritt v. Colonial Foods, Inc.*, 499 F.Supp. 910, 913–14 (D.Del. 1980); *Hundahl v. United Benefit Life Insurance Co.*, 465 F.Supp. 1349, 1364–66 (N.D.Tex.1979).

▮ Even assuming, however, that the breaches of fiduciary duty complained of in Count I were part of a "deceptive scheme" within the meaning of section 10(b), Twenty Seven is still not entitled to relief under federal law. When viewed in terms of materiality, it is apparent that the deceptive conduct attributed to the defendants did not operate to deprive Twenty Seven of an opportunity to seek an injunction or other equitable relief under state law prior to the consummation of the merger. *E.g., Healy v. Catalyst Recovery of Pa., Inc.*, 616 F.2d at 645–48. To the contrary, Twenty Seven filed a complaint in this court on October 22, 1981, seeking to enjoin the shareholders' meeting of October 23, 1981, of which it had notice on or about October 12, 1981. Both the original complaint and Twenty Seven's motion for a temporary restraining order centered around allegations that if the merger were not enjoined, Twenty Seven would be deprived of its share of the tax loss carry forward and would be unable to receive the fair value of its investment.[16]

It is of little moment under the present circumstances that Twenty Seven did not prevail on its motion for a temporary restraining order. Twenty Seven has had notice of the defendants' intention to take control of Realty since May of 1981, and cannot reasonably complain that it was without sufficient information, due to the

defendants' nondisclosures, to fairly present its case for the granting of pre-merger equitable relief.[17] In the present context, therefore, neither section 10(b) nor Rule 10b–5 "obligate[d] defendants to reveal either the culpability of their activities, or their impure motives for entering into the allegedly improper transactions." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981). *See Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Insurance Co.*, 606 F.2d at 610–11; *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. at 1291; *Stedman v. Storer*, 308 F.Supp. 881, 887 (S.D.N.Y.1969).

Further, once pre-merger injunctive relief was denied, there was nothing Twenty Seven could reasonably have done to prevent the merger. RGI owned at that point in excess of 90% of Realty's outstanding shares. Assuming compliance with the procedural aspects of *Md. Corps. & Ass'ns Code Ann.* § 8–501.1 (1981 Cum.Supp.), the outcome of the merger vote was preordained.

In sum, the court concludes that Count I of the amended complaint must be dismissed for failure to state a claim for relief under the federal securities laws invoked by the plaintiff. Consequently, it is unnecessary to address whether the existence of a state appraisal remedy would affect the relief available to a plaintiff which did state a cognizable claim. *See Pellman v. Cinerama, Inc.*, 503 F.Supp. 107, 110 (S.D.N.Y. 1980).

### B. Breach of Fiduciary Duty

▮ With respect to Twenty Seven's breach of fiduciary duty claim under Count II, the defendants contend that Twenty Seven has waived its right to seek relief under Maryland common law. According to the defendants, by demanding fair value for its stock and filing an appraisal petition in this court, Twenty Seven has elected the

---

16. Paper Nos. 1 and 2.

17. Another result might obtain where a dissenting shareholder alleged that it did not know, and had no reason to know of, the majority's plans until after the merger was completed. In

other words, a different situation is presented where, prior to the merger and because of the defendant's conduct, the dissenter had no reasonable basis upon which even to seek equitable relief under state law.

remedy set out in *Md.Corps. & Ass'ns Code Ann.* §§ 3–201 to 3–212 (1975 & 1981 Cum. Supp.), to the exclusion of any remedies that might be available at common law.

Section 3–204 of the appraisal statute provides:

"A stockholder who demands payment for his stock under this subtitle:

(1) Has no right to receive any dividends or distributions payable to holders of record of that stock on a record date after the close of business on the day as at which fair value is to be determined under § 3–202 of this subtitle; and

(2) Ceases to have any rights of a stockholder with respect to that stock, except the right to receive payment of its fair value."

Section 3–205 provides:

"A demand for payment may be withdrawn only with the consent of the successor."

Section 3–206 provides:

"(a) *When rights restored.*—The rights of a stockholder who demands payment are restored in full, if:

(1) The demand for payment is withdrawn;

(2) A petition for an appraisal is not filed within the time required by this subtitle;

(3) A court determines that the stockholder is not entitled to relief; or

(4) The transaction objected to is abandoned or rescinded.

(b) *Effect of restoration.*—The restoration of a stockholder's rights entitles him to receive the dividends, distributions, and other rights he would have received if he had not demanded payment for his stock. However, the restoration does not prejudice any corporate proceedings taken before the restoration."

These statutory provisions suggest that, in the usual case, resort by a dissenting shareholder to the appraisal remedy constitutes a statutory election of remedies and bars resort to remedies otherwise available under common law. Well reasoned opinions from other jurisdictions with fairly similar appraisal statutes have so held. *See, e.g., Dofflemyer v. W.F. Hall Printing Co.*, 432 A.2d 1198, 1200–02 (Del.1981); *Johnson v. Baldwin*, 221 S.C. 141, 69 S.E.2d 585, 591–92 (S.C.1952). *Compare Farnsworth v. Massey*, 365 S.W.2d 1, 5–6 (Tex.1963) (noting but not deciding the question). *See also Breed v. Barton*, 54 N.Y.2d 82, 429 N.E.2d 128, 129–31 (1981).

In the court's view, this case involves circumstances warranting a departure from any general rule of election that might arise from the above-quoted statutory provisions.[18] Unlike the plaintiffs in *Dofflemyer*, 432 A.2d at 1199, who first sought appraisal rather than other equitable relief, Twenty Seven is the only minority shareholder.[19] According to a codifier's comment, first appearing in the 1973 version of the Maryland Code, the above-quoted sections of the Act were

"designed to confine a stockholder to an election once made to demand appraisal, thereby eliminating the possibility of a subsequent abandonment *to the disadvantage of other stockholders.*"

*Md.Code Ann.* art. 23, § 73, at 84–85 (1973 Rep.Vol.), *quoted in Md. Corps. & Ass'ns Code Ann.* Comment to § 3–202, at 111 (1975) (emphasis supplied).

In this case, Twenty Seven first sought relief by way of a motion for a temporary restraining order. It was only after that motion was denied by the Chambers Judge did Twenty Seven seek to preserve any rights it might have under the appraisal statute.[20] Moreover, because the merger

---

**18.** The court is aware of no Maryland cases addressing the election issue. It should be noted that Twenty Seven would not be held to an election under the common law standard. *E.g., Surratts Associates v. Prince George's County*, 286 Md. 555, 567–68, 408 A.2d 1323 (1979).

**19.** The plaintiffs in *Dofflemyer* moved to dismiss the appraisal proceeding just six days prior to the hearing, although the appraisal petition had been filed some six months earlier. 432 A.2d at 1200.

**20.** If Twenty Seven had not filed its appraisal petition within the time set out in *Md. Corps. &*

has already been completed, the maintenance of this action will not delay RGI's acquisition of Twenty Seven's "stockholder rights." *See Md. Corps. & Ass'ns Code Ann.* §§ 3–204(2), 3–213 (1981 Cum.Supp.). Finally, this case involves serious allegations of breach of fiduciary duty, which alone may be a sufficient reason for an exception to a rule of election. *See Breed v. Barton*, 429 N.E.2d at 130–31; *Johnson v. Baldwin*, 69 S.E.2d at 591. *See also Cole v. Wells*, 224 Mass. 504, 113 N.E. 189 (1916). In sum, the court concludes that Twenty Seven's action for breach of fiduciary duty is not barred due to an election of remedies.[21]

Although the parties have not squarely confronted the issue in their memoranda, it is appropriate for the court to comment briefly on the nature of the dominant or controlling shareholders' duty in a case such as this, which is the functional equivalent of a short-form merger. The Maryland cases discussed in section II(A), *supra*, do establish that under "certain circumstances" there arises in the majority a duty not to abuse its power of control to the minority's detriment. *E.g., Cooperative Milk Service, Inc. v. Hepner*, 198 Md. at 114, 81 A.2d 219. Nevertheless, *Homer v. Crown, Cork & Seal Co.*, 155 Md. at 83–85, 141 A. 425, indicates that in a merger situation the alleged inadequacy of price alone does not warrant court intervention in corporate affairs.[22]

The better reasoned cases from other jurisdictions are not in complete accord either as to what purposes would justify a minority freeze-out or the scope of the court's review of the substance of the transaction. *See, e.g., Dower v. Mosser Industries, Inc.*, 648 F.2d 183, 188–91 (3d Cir. 1981) (under Pennsylvania law purpose cannot be for continuing business for the sole benefit of the majority; complete control may be assumed for financial reasons); *Roland International Corp. v. Najjar*, 407 A.2d 1032, 1036–37 (Del.1979) (purpose cannot be to eliminate minority interest; transaction subject to review for fairness despite valid purpose); *Gabhart v. Gabhart*, 267 Ind. 370, 370 N.E.2d 345, 354–56 (1977) (merger must advance a corporate interest; cannot be used to accomplish a *de facto* dissolution). *See generally* Brudney & Chirelstein, *A Restatement of Corporate Freezeouts*, 87 *Yale L.J.* 1354 (1978).

Twenty Seven has alleged that the sole purpose for the merger was to deprive it of any share in Realty's federal tax loss carry forward. Although the defendants contended at the hearing, and may ultimately show, that the merger was for legitimate business purposes and did not involve any unfairness, *see Tanzer v. International General Industries, Inc.*, 379 A.2d 1121, 1123–25 (Del.1977), whether such is the case cannot be resolved on a motion to dismiss. In sum, the court concludes that Twenty Seven's allegations in Count II of the amended complaint state a cognizable claim under Maryland law.

## C. *Common Law Fraud*

In Count III, Twenty Seven asserts that the defendants' conduct, as described

---

*Ass'ns Code Ann.* § 3–208(a) (1975), it would have lost its right to appraisal. *Ash v. Citizens Building & Loan Ass'n*, 225 Md. 395, 401–02, 170 A.2d 750 (1961).

21. Under the circumstances, it appears appropriate for the court to appoint appraisers and direct them to prepare a report. *Md. Corps. & Ass'ns Code Ann.* § 3–210 (1975). Of course, Twenty Seven cannot be accorded both rescission of the merger and restitution of its 6.9% interest, and fair value of its shares under the appraisal statute. Should Twenty Seven prevail as to its request for equitable relief, the court will then decide the appropriate allocation of the costs of the appraisal. *Id.* § 3–211(d).

22. The defendants have not challenged Twenty Seven's right to maintain this action solely in its own behalf, rather than derivatively. *See Waller v. Waller*, 187 Md. 185, 189–91, 49 A.2d 449 (1946). In any event, there is persuasive authority supporting Twenty Seven's right to seek an individual recovery in a case such as this. *See, e.g., Perlman v. Feldmann*, 219 F.2d 173, 178 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Zahn v. Transamerica Corp.*, 162 F.2d 36, 48–49 (3d Cir. 1947); *Lebold v. Inland Steel Co.*, 125 F.2d 369, 372–74 (7th Cir. 1941), *cert. denied*, 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749 (1942).

throughout the amended complaint, constitutes "common law fraud in the solicitation of Twenty Seven's proxy in that the defendants knowingly made false and misleading statements to Twenty Seven with the intent that Twenty Seven would rely thereon to its injury in executing its proxy."[23]

It is settled that there are five elements required under Maryland law to state a claim for deceit. *See, e.g., James v. Weisheit,* 279 Md. 41, 44, 367 A.2d 482 (1979); *James v. Goldberg,* 256 Md. 520, 528–29, 261 A.2d 753 (1970). One essential element in any such fraud claim is that the person allegedly defrauded actually relied on the misrepresentation. *Appel v. Hupfield,* 198 Md. 374, 378, 84 A.2d 94 (1951). In this case, the amended complaint itself establishes that Twenty Seven did not rely on any misrepresentations or omissions in the proxy because Twenty Seven voted against the proposed merger.[24] Consequently, Count III does not state a claim for relief from fraudulent deceit under Maryland law, *Savings Bank Retirement System v. Clarke,* 258 Md. 501, 506–08, 265 A.2d 921 (1970), and will be dismissed.[25]

### D. *Shareholder Discrimination*[26]

In Count V, Twenty Seven contends that the defendants engaged in unlawful shareholder discrimination. Twenty Seven alleges that in connection with RGI's $14.31 per share tender offer, Realty and RGI agreed that Realty would make a distribution to all pre-tender shareholders. According to Twenty Seven, although all of Realty's shareholders were of the same class, shareholders owning 1000 shares or less received $17.19 per share in cash while shareholders

owning more than 1000 shares, such as itself, received $15.29 per share in distribution certificates and secured notes.

Like corporations, a real estate investment trust, in accordance with its trust declaration, may issue different classes of ownership shares and afford them differing rights. *Md. Corps. & Ass'ns Code Ann.* §§ 8–202(b)(9), 8–203 (1981 Cum.Supp.). Consequently, if Realty's declaration of trust had provided for classes of shares with differing distribution rights, and the distribution complained of was made pursuant to that instrument, such would be permissible under Maryland law. *See Wall & Beaver Street Corp. v. Munson Line, Inc.,* 58 F.Supp. 109, 116 (D.Md.1944). Twenty Seven has alleged, however, that the shareholders receiving the differing distributions were all of the same class.

If the distribution at issue were a corporate dividend, it is plain that a claim for relief would be stated. It is hornbook law that unless the corporate charter properly provides otherwise, all shareholders of the same class must participate in dividends on a pro rata basis without discrimination or preference. *E.g.,* 11 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5352 at 723–24 (rev.perm.ed.1971); H. Henn, *Law of Corporations* § 324 at 659 (2d ed. 1970). This rule of nondiscrimination among shareholders of the same class refers not only to the amount of the dividend but also to its form. *Maryland v. Baltimore & Ohio R.R. Co.,* 6 Gill. 363, 386 (Md.1847).

Although the distributions made by Realty are not strictly dividends, the court concludes that they are sufficiently analogous to dividends to warrant the application of the nondiscrimination rule.

---

23. Paper No. 9, at ¶ 28.

24. Paper No. 9, at ¶ 18.

25. To the extent that Count II purports to state a claim for concealment, *see, e.g., Levin v. Singer,* 227 Md. 47, 64, 175 A.2d 423 (1961); *Fegeas v. Sherrill,* 218 Md. 472, 476–77, 147 A.2d 223 (1958), it too is subject to dismissal for lack of reliance.

26. The defendants' dismissal motion does not address directly Twenty Seven's claim in Count

IV under the Maryland Securities Act, *Md. Corps. & Ass'ns Code Ann.* §§ 11–301, 11–703 (1975 & 1981 Cum.Supp.). Although these state law provisions are similar to section 10(b) and Rule 10b–5, the court is not inclined to rule upon the viability of Count IV without the benefit of briefing by the parties. Accordingly, if the defendants wish to challenge Count IV, they may do so by motion under Rule 56, Fed. R.Civ.P.

For the reasons set out above, it is this 22nd day of February, 1982, ORDERED:

1. The defendants' motion to dismiss Twenty Seven's amended complaint is GRANTED as to Count I and Count III, and is DENIED as to Count II, Count IV and Count V.

2. The Clerk shall forward a copy of this Memorandum and Order to counsel for the parties.